IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CATHY GIRONDI, o/b/o<br>A.G., a minor,<br><br>   Plaintiff,<br><br>   v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>   Defendant. | Case No: 09 C 3623<br><br>Magistrate Judge Jeffrey Cole |

## MEMORANDUM AND ORDER

The plaintiff, Cathy Girondi, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her minor daughter, Anna Girondi's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1383(c)(3). Ms. Girondi asks the court to reverse and remand the Commissioner's decision or remand for consideration of additional evidence, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Ms. Girondi applied for SSI on behalf of her daughter, Anna, on May 26, 2006. (Administrative Record ("R.") 101-03). She claimed she had been disabled since May 23, 2006 (R. 101), due a learning disability. (R. 120). The application was denied initially and upon reconsideration. (R. 48-53, 60-65). Ms. Girondi continued pursuit of the claim by filing a timely request for hearing on January 10, 2007. (R. 67).

An administrative law judge ("ALJ") convened a hearing on October 3, 2008, at which Ms. Girondi and her daughter, represented by counsel, appeared and testified. (R. 22-47). On November 25, 2008 , the ALJ issued a decision denying the application for SSI, because Anna did not have an impairment or combination of impairments that met, equaled or functionally met the Listings. (R. 9-21). Ms. Girondi sought a review of the decision from the Appeals Council and submitted evidence of educational and intellectual testing performed between November and December of 2008. (*Plaintiff's Motion to Remand*, ¶¶ 2-3). The Appeals Council denied the request for review without mentioning the additional evidence, and the ALJ's decision became the final decision of the Commissioner on April 17, 2009. (R. 2-3). *See* 20 C.F.R. §§ 404.955; 404.981. Thereafter, Ms. Girondi filed another application and, based on the additional evidence she had provided the Appeals Council earlier, Anna was found disabled as of November 26, 2008. (*Plaintiff's Motion to Remand*, Ex. E). This was the earliest date that Anna could be found disabled given the previous ALJ's decision on November 25th. Ms. Girondi has appealed that previous decision to the federal district court under 42 U.S.C. § 405(g) and has asked that the case be remanded for the consideration of new and material evidence, mainly that evidence that she had submitted to the Appeals Council and which formed the basis of the later favorable decision. The parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

# II.

# EVIDENCE

## A.

### Evidence the ALJ Considered

Anna was born on July 25, 1994, and was fourteen years old at the time of the ALJ's decision. She has a long history of struggles in school, beginning with kindergarten, which she had to repeat. (R. 185). By the third grade, she was placed in a learning disabilities resource program due to "extreme academic difficulties." (R. 185). These additional resources were increased in fourth grade, and she began to have language therapy as well. (R. 185). She continued to struggle, however, and in sixth grade, she had to make a great deal of effort to get "C's" in her special classes – she was mainstreamed only in music, art, and gym, and took regular social studies with the help of a teaching aid. (R. 185). She was two grades behind in reading decoding (in the bottom 18% of children her age) and three behind in reading comprehension (bottom 9%), working at the mid-third-grade level in reading composite (bottom 12%), math computation (bottom 5%), and battery composite (bottom 5%), and her math application skills were at the mid-first-grade level (bottom 1%). (R. 185). She was a pleasant student and a hard-worker. (R. 187). It was recommended that Anna be placed in a learning disabilities program. (R. 188).

Further evaluation revealed that, although twelve-and-a-half years old, Anna had the single-word comprehension level of an eight year old. (R. 189). Her speech rhythm was disrupted, and she exhibited garbled productions. (R. 189). She would need Speech and Language services at school. (R. 189). Anna's social worker at her school reported

that she had Anna for thirty minutes of individual counseling and ninety minutes of group counseling per week. (R. 169). This was the maximum amount available. (R. 170). She had both a speech and language impairment and a learning disability. (R. 169). The social worker said that Anna struggled emotionally and with social skills. (R. 170).

The Agency arranged for a Weschler Intelligence Scale for Children test for Anna in connection with her mother's application for SSI in June 2006. Her verbal comprehension score was 71, perceptual reasoning score was 69, working memory score was 77, processing speed score was 85, and full scale IQ was 70. (R. 279). Psychologist Jeffrey Karr said Anna was pleasant and eager to cooperate – her scores were valid. (R. 281). He diagnosed borderline intellectual functioning. (R. 281).

The Agency also arranged for a speech and Language evaluation in July of 2006. The speech pathologist, Eileen Donnelly, remarked that Anna was friendly and cooperative. (R. 284). Anna spoke quickly and had difficulty finding words. (R. 284). Her speech was generally intelligible, less so when the topic of conversation was unfamiliar to her. (R. 285). She fared better when instructed to slow down. (R. 285). In terms of listening comprehension, although she was twelve, Anna exhibited the skills of six year old. (R. 285). In terms of oral expression, she was the equivalent of a seven-and-a-half year old. (R. 286). Ms. Donnelly said these skills were severely and moderately delayed, respectively. (R. 286). Anna's total language score was in the bottom 1%, meaning she was operating at the level of a child aged six years and nine months. (R. 287).

In August 2006, Dr. Glen Pittman and speech pathologist Carol Varney reviewed these two reports on behalf of the Agency. They determined that Anna did not have an impairment that met, equaled, or was functionally equivalent to the Listing. (R. 288). They found she was markedly limited in the ability to acquire and use information, and less than markedly limited in terms of interacting and relating with others. (R. 290).

Anna underwent a psychological evaluation at school in October of 2006, when she had just begun the sixth grade. (R. 191). Psychologist Allan Lang administered a Weschler Intelligence Scale for Children. Anna scored in the bottom 6% of children her age in verbal comprehension (score of 77 – higher than the June 2006 score), the bottom 18% in perceptual reasoning (66 – lower), the bottom 21% in working memory (88– higher), the bottom 13% in full scale IQ (83 – higher). (R. 192). She was in the fiftieth percentile terms of processing speed (100). (R. 192). She was in the bottom 5% in reading (76), bottom 12% in written expression (82), bottom 0.5% in mathematics (61), and bottom 1% in reading comprehension (65). (R. 193). Dr. Lang commented that Anna did not have any strengths in academic achievement, but had made progress in numerical operations since 2003. (R. 195). She had regressed in math reasoning, however. (R. 195). She seemed to be "successful in her self-contained cross-categorical special education placement. (R. 195). He recommended that "appropriate intervention" be considered. (R. 195).

In December 2006, Leon Jackson, Ph.D., and speech pathologist Michelle Curran reviewed the record with the same reports as Dr. Pittman and Ms. Varney had six months earlier and arrived at the same conclusion. (R. 303-308). They didn't consider Dr. Lang's report. (R. 308).

In December of 2006, Anna's teacher, Susan Szubert, completed a checklist regarding Anna's limitations. Ms. Szubert noted that, while Anna was in the sixth grade, she was reading and performing math computations at a fourth grade level, doing math applications at a second or third grade level, and writing at a third grade level. (R. 173). Anna received special educational services for about 70% of the day. (R. 173). Ms. Szubert indicated that Anna had a problem acquiring and using information, which included obvious problems in comprehending oral instructions, reading and comprehending written material, comprehending and doing math problems, providing oral explanations, expressing ideas in writing, learning new material, recalling and applying previously learned material, and applying problem-solving skills. (R. 174). There was also a problem in the area of caring for oneself, including slight problems with personal hygiene, identifying and asserting emotional needs, and using coping skills in the school environment. (R. 178). Ms. Szubert did not note any limitations in attending and completing tasks, interacting and relating with others, or moving about and manipulating objects.

On her fall report card from 2008, Anna got B+ in Language and Literature, B in Science, C's in Academic Supplement, Physical Education, and Social Studies, and D in Math. (R. 313). She was having trouble preparing for classes and completing assignments on time. (R. 313). Anna was reading at a level that was well below average. (R. 314).

**B.**

**Administrative Hearing Testimony**

At her hearing, Anna told the ALJ that she was in eighth grade and was taking Science, Literature, Language, Social Studies, and Gym. (R. 29). Her class had ten

children and two teachers. (R. 28, 34). She said she wasn't reading "chapter books" yet, just "big ones" with "different pages." (R. 29-30). Anna said she "mostly can't read." (R. 36). She didn't read at home because her mother couldn't help her; her mother was unable to read. (R. 36-37). Anna wasn't able to write cursive yet either. (R. 30). Anna made "five or ten" friends at school. (R. 30). Her friends came over to her house, or she went to theirs to play video games. (R. 30-31). Anna said she had a journal she tried to write songs in. (R. 31-32). She played with her puppy. (R. 32). She liked playing basketball in gym. (R. 33).

Ms. Girondi testified that when she was pregnant with Anna, she was beaten everyday. (R. 39). Anna was born prematurely, and had crooked hands and a problem with her knee. (R. 39). Ms. Girondi was on SSI. (R. 39). She couldn't afford tutors for Anna. (R. 40). Ms. Girondi felt bad because she couldn't do anything for Anna and didn't want Anna to be like her. (R. 40). Anna had to do her homework at school where the teachers could help her. (R. 43). Anna had trouble remembering things and couldn't focus. (R. 43-44). Ms. Girondi's attorney informed the ALJ that Anna would be undergoing further testing a couple of weeks after the hearing, and the ALJ said he would leave the record open for thirty days. (R. 28-29). When the attorney said that he wasn't sure if the results would be in by then, the ALJ indicated he could have more time if it was needed. (R. 29). On November 10th – the hearing had been on October 3rd – counsel wrote to the ALJ to tell him that the results would not be available until January. (R. 312). Counsel added a request for a supplemental hearing when the results were made a part of the record, with a medical advisor. (R. 312). The ALJ issued his decision two weeks later, before the results were completed. (R. 21).

## C.

## Evidence Submitted After the Hearing

On her eighth-grade evaluation in October 2008, Anna continued to lag years behind other children her age. Her composite score was in the bottom 3% of children her age. Her English score was in the bottom 10%. She scored in the bottom 2% in math, the bottom 29% in reading, and the bottom 10% in science. The courses she was going to take in high school, given her limited abilities, fell far short of the recommended high school curriculum. (Ex. A)

Anna's course plan for the autumn of 2009 had her in a self-contained, special education classroom for every subject but physical education. For the next school year, she would take physical education classes and choir with special assistance. Anna needed instruction in small group settings, that was slow-paced and offered the opportunity for re-teaching. Even with a supplementary help, Anna would not be able to keep up the pace required in a regular classroom.

Anna had another intelligence evaluation in March 2010. Her full-scale IQ was 65. During the testing, Anna required repeated instructions. She tried hard, but tended to perservate. Anna needed reminders about hygiene and was unable to complete chores. She could not count change or remember phone messages. She had friends, but they were younger than she. Anna was diagnosed as mildly retarded.

## III.

## THE ALJ'S DECISION

The ALJ stated that Anna, born on July 25, 1994, was a school-aged child on the date of her SSI application and was currently an adolescent. (R. 12). He found that she

suffered from a severe impairment: borderline intellectual functioning. (R. 12). The ALJ concluded that Anna's impairment did not meet or equal the requirements of any listed impairment, stating:

> With respect to listing 112.02 [Organic Mental Disorders], while the record suggests some impairment in cognitive functioning, the claimant is not markedly impaired in cognitive functioning, social functioning, personal functioning, or with respect to concentration, persistence or pace. With respect to listing 112.05 [Mental Retardation], while the claimant's counsel argued that testing from June 28, 2006 suggested a full scale IQ of 70 thereby satisfying the initial criteria of 112.05E, subsequent IQ testing conducted on October 19, 2006 showed a full scale IQ of 83. Additionally, with respect to the additional criteria required to satisfy listing 112.05E, the undersigned cannot conclude that the claimant is markedly impaired in social functioning, personal functioning, or with respect to concentration, persistence or pace.

(R. 12). The ALJ said his conclusion was bolstered by the reports of the reviewing state agency physicians. (R. 12).

The ALJ went on to determine that there was no functional equivalence to a listed impairment, specifically finding that Anna had a less than marked limitation in "acquiring and using information" (R. 14-15); a less than marked limitation in "attending and completing tasks" (R 16-17); a less than marked limitation in "interacting and relating with others" (R 17-18); no limitation in "moving about and manipulating objects" (R 18-19); no limitation in "caring for oneself" (R. 19-20); and no limitation in "health and physical well being." (R 20-21).

In reaching these conclusions, the ALJ reviewed Anna's test scores and grades. (R. 15-16). He noted that other than a D in math, she had a B average on her most recent report card. (R. 15). The ALJ remarked that Anna's IQ score was significantly higher in November 2006 than it had been in June 2006. (R. 15). He said that Anna's strengths were in reading fluency, spelling, and math computations; her weaknesses were in

9

reading comprehension and math application. (R. 15). He looked to her mother's report of academic improvement, her teacher's report of improvement in math, and Dr. Lang's remark that she was doing well in her self-contained, special education classes. (R. 15). The ALJ rejected the opinions of the state agency physicians who had all found Anna markedly limited in acquiring and using information. (R. 15). The ALJ also pointed to a report from Anna's teacher that she had no problem completing tasks and her mother's statement to school evaluators that she does her homework without being reminded, and the school evaluators statement that she completes all her homework and studies for assigned tests. (R. 16). The ALJ further stated that Anna testified that she had friends over or visited them at their homes, and her teacher reported she had no problem interacting with others, and reviewed the results of Anna's session with the speech pathologist. (R. 18). He noted Anna needed reminders about hygiene, but that she kept a journal, wrote song lyrics, and interacted with friends and family. (R. 20). Accordingly, the ALJ found that Anna had no marked limitations in any domain, and that she was not disabled under the Act. (R. 21).

## IV.

## DISCUSSION

### A.

### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008),

*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

**B.**

**Sequential Analysis**

A child is disabled under the Act if she has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486-87 (7th Cir.2007). At the outset, if the child is engaging in substantial gainful activity, the claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Next, if she does not have a medically severe impairment or combination of impairments, the claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Finally, the child's claim will be denied unless her impairment meets, or is medically or functionally equivalent to, one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486-87.

The determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate standpoint: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits, if the ALJ finds she has marked difficulty in two domains of functioning or an extreme limitation in one. 20

C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A marked limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i); *Giles*, 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). An extreme limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

## C.

There are troubling aspects of the decision denying Anna SSI. To begin with, the ALJ indicated that he would keep the record open for the presentation of additional test results. Now, to be sure, counsel was late in contacting the ALJ for additional time – the ALJ had given counsel thirty days, and counsel apparently did not write for additional time until thirty-seven days had passed. But at the close of the hearing the ALJ seemed amenable to giving counsel whatever time it took to get the results, and the ALJ did know that the test results would be forthcoming before he rendered his decision about three weeks later.

The treatment of this additional evidence became a bit more disconcerting when counsel submitted it to the Appeals Council in support of a request for review of the ALJ's decision. The decision of the Appeals Council on a request for review invariably lists the additional materials considered, but there was no mention of any additional

evidence in the action on Anna's claim. (R. 4). Moreover, it was not included in the record, so it would appear that the Appeals Council simply ignored it or that is was lost somewhere in the bureaucratic morass. *See Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993)(even when the Appeals Council denies review the additional evidence should be a part of the administrative record).

Under the regulations, the Appeals Council must "evaluate the entire record," including "new and material evidence," in determining whether to grant review. 20 C.F.R. § 404.970(b); *Sims v. Apfel*, 530 U.S. 103, 111 (2000). It appears that the Appeals Council didn't do that here; it may not have even looked at the evidence to determine *if* it was new and material. At a hearing following the briefing of this case, no explanation was forthcoming for these apparent missteps from the Commissioner. So the reviewing court is left to wonder.

Sentence six of 42 U.S.C. §405(g) allows a remand to the agency "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." "New" evidence is evidence which was "not in existence or available to the claimant at the time of the administrative proceeding." *Simila v. Astrue*, 573 F.3d 503, 522 (7th Cir. 2009); *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir.1997). The additional evidence in this case is clearly new: the test results simply weren't available before the ALJ's decision. And, it might be argued, the ALJ's action prevented that availability.

New evidence is 'material' if there is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Simila*, 573 F.3d at 522; *Schmidt v. Barnhart,* 395 F.3d 737, 742 (7th Cir.2005). Here, in one

respect, even the Commissioner thought this evidence was material. After a second application and another round of administrative proceedings, a second adjudicator determined that the plaintiff was disabled and entitled to SSI due to mental retardation. The additional evidence that seemed to be avoided in the first round was a key factor in this second, conflicting decision. "Conflicting" is a term used advisedly because an impairment such as mental retardation does not manifest spontaneously but is rather a lifelong condition. *Guzman v. Bowen,* 801 F.2d 273, 275 (7th Cir.1986). A person's IQ is presumed to remain stable over time absent any evidence suggesting a change in level of functioning. *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001); *Branham v. Heckler,* 775 F.2d 1271, 1274 (4th Cir. 1985).[1] Indeed, the second adjudicator acknowledged as much in her decision granting benefits, but was constrained by the earlier, conflicting decision to find the plaintiff's onset of disability to be the day after the previous decision.

Obviously, it the plaintiff did not suddenly "come down" with mental retardation of a disabling degree on November 26, 2008, but was not markedly impaired the day

---

[1] The Commissioner argues that a sentence-six remand is inappropriate because much of the additional evidence relates to the time period after the date of the ALJ's decision. The Commissioner relies on *Getch v. Astrue*, 539 F.3d 473 (7th Cir. 2008) and *Schmidt v. Barnhart*, 395 F.3d 737 (7th Cir. 2005) for support. Although *Getch* and *Schmidt* state that medical evidence is not material if it postdates the ALJ's decision, generally speaking, the cases also make an exception for evidence that nonetheless "speaks to the patient's condition at or before the time of the administrative hearing." *Getch*, 539 F.3d at 484; *Schmidt*, 395 F.3d at 742 (evidence relating to condition at the time application was under consideration can be material). Notably, the evidence found to be immaterial in those cases related to a condition that had worsened since the ALJ's decision. *Getch*, 539 F.3d at 484; *Schmidt*, 395 F.3d at 742.

Here, the evidence under consideration concerns Anna's level of mental functioning – her IQ and her degree of mental retardation, which is a lifelong condition. *Guzman v. Bowen,* 801 F.2d 273, 275 (7th Cir.1986). So, for example, Anna's full-scale IQ score of 65 in March 2010 is relevant to her condition prior to the ALJ's decision. The Commissioner – or the Appeals Council or the ALJ – can't disregard it simply because the test was taken after the ALJ's decision.

before. She certainly didn't begin functioning several grade levels below what she should be on that date either. Moreover, under cases like *Guzman*, evidence regarding such an impairment would relate back to the plaintiff's condition when the first adjudicator was evaluating her claim for SSI. So, this additional evidence certainly appears to be the type that would have a reasonable probability of altering the ALJ's decision. The Commissioner has determined it shows Anna is disabled.[2]

In another respect, it is not so clear this evidence would have changed the ALJ's mind if he had considered it. After all, it essentially reaffirms that Anna is far behind her peers in a number of academic areas. But the evidence that the ALJ allowed into the record already confirmed that. The additional evidence, however, added certain elements that may not have been entirely clear before. For example, although Anna does socialize, she does not do so with children her own age. She seems to have more and more difficulty keeping up and finishing her assignments. She doesn't seem to be gaining ground. The ALJ in this case, however, might not have thought any of the evidence was persuasive, whether it should have been or not. But his decision was flawed in enough aspects that it would have to be remanded anyway.

The ALJ determined that Anna had a "less than marked" impairment in acquiring and using information. In so doing, he rejected the assessments of two medical experts whom the disability agency assigned to review Anna's case. Instead, he based his

---

[2] Because an ALJ's decision need only be supported by substantial evidence, it is possible that two different adjudicators could reach different conclusions based on the same record, and both results would be supported by substantial evidence. But this is not an argument the Commissioner made when asked to account for the conflicting decisions regarding Anna's application in a hearing on December 3, 2010. Accordingly, any such the contention is forfeited. *United States v. Knox*, 624 F.3d 865, 873 n.6 (7th Cir. 2010).

assessment on Anna's performance in her special education classes eight grade. With the exception of one D in math, he noted, she was getting a B average – actually, a 2.6. He said that her mother described her as doing well in school during a phone interview. And teachers reported she was improving in math. (R. 15).

In reaching this conclusion, the ALJ ignored significant facts: Anna was held back for one year in school, so at the time she was in eighth grade, she ought to have been a freshman in high school. Throughout her schooling, she has performed a number of grade levels behind the expected level. In sixth grade – when she was actually of seventh-grade age, her reading comprehension was that of a third-grader. (R. 186). Her use of math skills was the equivalent of a first-grader. (R. 186). Overall, she performed at a level expected of a third-grade student. (R. 186). There is no information regarding what grade level she was performing at when she was in eighth grade, but she was in small, special education classes all day. The applicable regulation makes a "structured setting" a part of calculus in a child's disability determination. *See* 20 C.F.R. § 416.924a(b)(5)(iv)(B);(C). The ALJ noted that Anna was in special education, but the fact that he put so much stock in her B's and C's shows he really didn't take the reality of the situation into account. He's not allowed to simply ignore such evidence. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir.2009).

Anna is four and five grades behind other children her age. She requires special assistance in small classes to get those B's and C's and D's. Her improvement in math is relative – she was the equivalent of a first-grader when she should have been performing at a seventh grade level. The fact that her mother was hopeful about her progress is

meaningless in this calculus. What else would her mother – who is also mentally challenged and on disability – be expected to say? Her teachers give her glowing reports because she tries very hard and wants to do better and is a pleasant student to have in the class. But, clearly, her performance in her special education classes does not support the ALJ's determination that she has a less than marked impairment in her ability to acquire and use information.

Much the same can be said of the ALJ's determination that Anna had a less than marked limitation on her ability to interact with others. The ALJ based this conclusion on testing related to Anna's speech intelligibility, the existence of friends, and her participation in class. (R. 18). In reaching this conclusion, ALJ ignored a significant piece of evidence. Anna's speech may be intelligible, but evaluations indicate that, in terms of listening comprehension, she only had the skills of a child half her age. (R. 285). In terms of oral expression, she was only slightly better. (R. 286). Her overall language abilities were in the bottom 1% of children her age. So, a fourteen-year old might speak intelligibly, but if it is the intelligible speech of a seven-year old, that would seem to be quite a deficit. The ALJ failed to consider this at all, and so the underpinnings of his determination regarding Anna's ability to interact with others is compromised.

Moreover, the ALJ failed to take into account that, while Anna has friends, they are all younger than she. This may or may not have been apparent from the record before the ALJ – although the ALJ didn't ask Anna how old her friends were – but it is made clear in the additional evidence. It's a significant piece of information because, under the regulations, an ALJ has to consider whether a child has friends of her own age. 20

C.F.R. §§416.926a(i)(2)(v); 416.926a(i)(3)(ii). Because he failed to consider these factors, the ALJ's finding regarding Anna's ability to interact with others is flawed as well. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir.2009).

As a result, when all the available evidence is considered, it may well be that Anna is actually markedly limited in at least two areas – areas in which the ALJ felt she had a "less than marked limitation." If she is markedly limited in two domains, she would be disabled in terms of functional equivalency to the listings. Indeed, it may well be that, when the additional evidence is considered, the ALJ will determine that Anna actually meets listing 112.05 for mental retardation.

## CONCLUSION

The plaintiff's motion for reversal and remand [#18, 20] is GRANTED, and the Commissioner's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceeding consistent with this opinion, including the consideration of additional evidence pursuant to sentence six of §405(g).

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 5/6/11